UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

SHAWN NEWSOME                :    CIVIL NO. 3:01CV1968 (DJS)
    Petitioner

V

COMMISSIONER OF CORRECTION   :    NOVEMBER 17, 2003
    Respondent

## MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR A WRIT OF HABEAS CORPUS

### NATURE OF THE CASE

The petitioner, Shawn Newsome, at his criminal trial was charged with one count of murder, for the shooting death of Lorenzo Surrency, in violation of §53a-54a(a) of the Connecticut Penal Code. He was found guilty and on April 15, 1994 was sentenced to the custody of the Commissioner of Correction to a term of forty-five (45) years. On June 6, 1994 he filed an appeal with the Connecticut Supreme Court claiming that the evidence at the hearing in probable cause was insufficient, that the evidence was insufficient to sustain his conviction, that there was jury misconduct, and the predicates for the admission of a statement under **State v Whalen**, 200 Conn. 743, 513 AS.2d 86, cert. denied 479 U.S. 994 (1986), should be modified. Petitioner's conviction was upheld, **State v Newsome**, 238 Conn. 588, 682 A.2d 972 (1996).

The petitioner filed a petition for a writ of habeas corpus,

dated April 30, 1997, claiming his trial counsel, Attorney Carol Goldberg, a Supervisory Assistant Public Defender, was ineffective. On December 29, 1998 an amended petition was filed again alleging ineffective assistance of trial counsel. The amended petition alleged trial counsel was ineffective in that trial counsel failed to conduct an adequate pretrial investigation of the facts and the applicable law, failed to object to inadmissable evidence and erroneous instructions, failed to suppress an out-of-court identification, failed to properly cross-examine state's witnesses, failed to object to the trial court's jury instructions as to the crime charged, failed to challenge the sufficiency of the evidence, failed to obtain or preserve taped statements of witnesses, failed to request proper jury instructions, and failed to litigate an issue of juror misconduct. A hearing was held before the Honorable Jon M. Alander on February 23, 2000 and on May 16, 2000 the petition was denied. Petitioner then filed a petition for certification which was denied on May 24, 2000. Petitioner then filed an appeal to the Connecticut Appellate Court claiming the trial court abused its discretion in denying his certification to appeal. The appeal was dismissed, **Newsome v Commissioner of Correction**, 64 Conn.App. 904, 777 A.2d 757 (Memorandum decision, 2001). Petitioner filed certification for appeal with the Connecticut Supreme Court which was denied, **Newsome v Commissioner**

2

**of Correction**, 258 Conn. 921, 782 A.2d 1245 (2001).

FACTS UNDERLYING THE CONVICTION

Rodney Womble testified that on March 4, 1992 he was living in the City of Bridgeport and at about 10:30 PM he was standing in a parking lot on Trumbull Avenue. (T.11 247)  This area is part of a housing complex called Trumbull Gardens; Trumbull Avenue is the main street running through the complex. (T.10 76-77)  At trial Womble testified that at this time he witnessed a fight between the victim, Lorenzo Surrency, and "a bunch of guys" including Jared Fleming and a male only identified as "Fats".[1] (T.11 251)  Womble stated that Surrency was trying to get away and the group continued to beat him. (T.11 255)  In his trial testimony Womble stated that he never saw defendant that night and further testified that someone with a hooded sweatshirt shot Surrency but, because of the hooded sweatshirt, he could not see the shooters face.  He also stated that Fleming was not the shooter. (T.11 272, 325-328)

Bridgeport police detective Lynn DeSarli testified that she investigated the murder of Surrency; she went to the murder scene that evening and the following day interviewed Womble. (T.10 117-19)  Another police officer had given her Womble's name which led

---

[1]Vanessa Fleming testified that 'Fats' was the brother of defendant.  'Fats' was never identified by name.

3

her to interview him.    DeSarli found Womble washing his car in a parking lot on Trumbull Avenue about one block from the murder scene.    He agreed to go to the detective bureau and give a statement. (T.10 123-24)    DeSarli testified that Womble understood the questions she asked, he was coherent, and she made no promises to him in return for his statement. (T.10 131)    DeSarli showed him the photo arrays and asked if he recognized any one; Womble picked defendant from one array and Jared Fleming from the second array. (T.10 132-36, 148)    DeSarli further testified that Womble expressed fear that if he spoke against the defendant there were people out there who might get him. (T.12 378-39, 383)

Womble's statement was read into the record. Womble told the police that he was in the walkway of the first parking lot and was standing by the front of the food bus.    Surrency was behind the food bus and defendant, along with Jared Fleming, Fats, and someone called Major were trying to entice Surrency to fight but Surrency refused. Defendant poured beer on Surrency but he still refused to fight.    Major then tried to help Surrency but defendant pulled a gun and shot Surrency who was only three or four feet away. Defendant then drove away in a Buick Regal.    Womble was a bus length away when he observed the shooting. (T.11 311, Exh L)

Both Jared Fleming and his mother, Vanessa Fleming, testified at trial.    Vanessa Fleming lived  with her son, Jared Fleming,

4

along with defendant and defendant's brother, identified as "Fats".
(T.11 350)  Jared Fleming testified that he knew defendant for his
entire life, and that he knew Womble and Surrency from the
neighborhood. (T.11 228,239)  He testified that he was standing
next to a parked car before he started fighting with Surrency.  He
told the police, in a statement, that he was sitting on the car
drinking beer before the fight began.  He testified that he was the
only one fighting with Surrency. (T.11 223-25)  His mother came out
of her house and pulled him inside. (T.11 350-52)  Fleming stated
that after he was in the house he and his mother looked out the
window and he saw police cars an ambulance and a guy lying on the
ground.  He also saw defendant walking down the street with a girl.
(T.11 238-39)  Vanassa Fleming testified that she heard two to
three shots being fired and when she looked out of her window she
saw a police officer standing over Surrency. (T.11 353)

Both Vanassa Fleming and Jared Fleming gave statements to the
police which were introduced as states exhibits. (Exh. H, L and N)
Vanassa Fleming, in her trial testimony said she never went outside
after hearing the shots, however in her statement to the police she
said she heard two to three shots, heard screeching wheels, went
outside and saw the ambulance take Surrency to the hospital. (T.11
362-64)  Jared Fleming in his statement to the police stated that
while he was in the house watching television he looked out the

5

window and saw police cars and an ambulance outside.  He went
outside and saw  that Surrency was shot.  He went right back into
the house because he did not want to get involved. (T.12 387, Exh.
N)

Officer David Daniels, a Bridgeport police officer who was on
a security detail at Trumbull Green apartments testified he heard
two gun shots at about 10:30 PM and ran to the area where the shots
came from.  He found Surrency lying in a pool of blood about ten
feet from the food bus. (T.10 55, 56-63)  He also saw a car leaving
the area as he approached the scene. (T.10 72-73) Doctor Harold
Wayne Carver, Chief Medical Examiner for the State of Connecticut,
testified that Surrency died as the result of a gunshot wound to
the head which caused injury to his spinal cord. (T.11 198,203)


## ARGUMENT

Petitioner's first three claims concern the trial court's
admission of Womble's out of court inconsistent statement. **State v
Whalen**, supra. His first claim is that the evidence was
insufficient to sustain the conviction, secondly, that the
admission of the statement denied him due process under the
Fourteenth Amendment, and lastly, that this statement constituted
the sole evidence of his guilt and therefore violated due process
as set forth in **California v Green**, 399 U.S. 149, 164 n.15 (1970).

6

This claims are intertwined as they all involve petitioner's right of due process under the Fourteenth Amendment. In his state appeal defendant did not raise the federal due process claim he is now making. Before the Connecticut Supreme Court he claimed the evidence was insufficient to find him guilty and that the requirements of **Whalen**, supra, should be modified. The Supreme Court of the United States has declared that "[i]f state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." **Duncan v Henry**, 513 U.S. 364, 365-66 (1995). If petitioner claims that a state court ruling denied him certain federal constitutional rights "he must say so, not only in federal court, but in state court. **Ibid.** Because the due process claim was not raised in the Connecticut Supreme Court federal habeas corpus relief may not be granted.

If a review of petitioner's claims is undertaken it must be noted that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDEPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996) mandates that federal courts may not grant a petition unless adjudication by the state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

7

reliability." **State v Whalen**, supra, 200 Conn. 752.  The proscribed circumstances for the introduction of such statements is that the statement "is signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." **Id**. 753. The United States Supreme Court has adopted the same reasoning in allowing an out-of-court statement for substantive purposes. "Viewed historically, then, there is a good reason to concluded that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." **California v Green**, supra, 399 U.S. 158.

Petitioner claims that any rational trier could not find him guilty based upon the uncorroborated statement of Womble. Petitioner has not shown that allowing Womble's statement into evidence was contrary to due process as determined by the United States Supreme Court. **Williams v Taylor**, 529 U.S. 362, 412 (2000). In addition the Connecticut Supreme Court found ample corroboration. **State v Newsome**, supra, 238 Conn. 618-19. Daniels confirmed the time and location of the shooting and the departure of someone from the scene in an automobile moments after shots were fired.  Womble, in his statement, while not identifying the weapon, sated it sounded like a .38 caliber gun.  This was confirmed by

9

Edward McPhiilips, a firearms examiner who testified the bullet recovered at the autopsy was a .38 caliber bullet. (T.11 342-45) Jared Fleming admitted fighting with Surrency that night and Womble told the police he witnessed the fight. In addition, Womble told DeSarli he feared retaliation for giving the police this information which is an obvious motive for recanting the key evidence of petitioner as the shooter.

II.  The introduction of Womble's statement violates due process under the Fourteenth Amendment:

This argument is subsumed in petitioner's first and third argument. The respondent is unaware of any United States Supreme Court decision which holds the introduction of a prior consistent statement of the declarant who is a witness at trial and subject to cross-examination violates due process. As will be argued below the footnote cited to by petitioner in **California v Green**, supra, is dicta and no controlling under **Williams v Taylor**, supra, 443 U.S. 412.

III. The footnote in **Green** is dicta and therefore does not meet the requirements of clearly established Federal law as determined by the United States Supreme Court:

In **Williams**, Justice O'Connor summarized the Court's ruling expanding upon the two conditions set forth in 28 U.S.C § 2254(d)(1).[2] "Under the "contrary to" clause a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently that this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal

_____

[2] Although Justice Stevens wrote the majority opinion for the Court he was in the minority as to the proper interpretation of 28 U.S.C. §2254.

11

principles from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." **Id**. 412-13. The Court made clear that 'clearly established Federal law' "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decisions." **Id**. 412.

Petitioner's argument centers on a footnote in a 1970 case, where the Court commented that "considerations of due process, wholly apart from the Confrontation Clause, might prevent convictions where a reliability evidentiary basis is totally lacking . . ."[3] which has not been revisited since **Green** and therefore cannot serve as 'clearly established Federal law'.

> IV.  The trial court fully explored the alleged juror misconduct and correctly ruled that the claim lacked merit:

In order to fully evaluate this claim additional facts are necessary. Defendant filed a motion for a new trial, on June 1, 1993, based, in part, upon alleged juror misconduct in that a juror spoke with members of defendant's family prior to the verdict and that juror's had discussions about the evidence prior to the commencement of deliberations. The trial court spoke to the juror, who stated that he had only exchanged "hellos" with defendant's family and there was no discussion about the case. (T.13, 1-4) This issue was not raised on direct appeal.

---

[3] **California v Green**, supra, 399 U.S. 164 n.15.

12

Defendant filed a second motion, dated August 6, 1993, seeking a new trial; his claim was based on premature jury deliberations, independent jury investigation and exparte conversations between the trial court and the jury[4]. Prior to this motion being filed defendant's trial counsel, Attorney Carol Goldberg, an Assistant Public Defender, and Attorney James Ruane, a special Public Defender, met with a private investigator, James P. McNamara, who was given the actual jury questionnaires which contained each juror's telephone number.[5] (T.14, 5-8, 47-49)    McNamara testified that by using city directories he was able to get each jurors' address through their telephone numbers. (T.14, 55)  He spoke to certain jurors and reiterated what they had told him during the hearing conducted by the trial court.[6]  Based upon this testimony the trial court ordered that an evidentiary hearing involving eight

---

[4]. The third claim was not raised by the defendant at the hearing.

[5]. The trial court questioned the wisdom of this procedure in light of Conn. Gen. Stat. §51-232(c)(3) which reads in pertinent part "...Counsel shall be required to return such copies to the clerk...upon completion of the voir dire.  Except for disclosure made during voir dire or unless the court orders otherwise information inserted by jurors shall be held in confidence.  Such completed questionnaires shall not constitute a public record."

[6]. McNamara testified that he called one juror six times in a four day period trying to get an interview. (T.14, 51)  He further testified that Attorney Goldberg and Attorney Ruane told him what he should ask the jurors. (T.14, 8)

13

jurors be held.[7] (R.27-31)

It cannot be questioned that the due process clause of the fourteenth amendment extends to state court defendants the right to be tried by an impartial jury. **Nebraska Press Association v Stuart**, 427 U.S. 539, 551 (1967). "Due process requires that a criminal defendant be given a fair trial before an impartial jury." **Rushin v Spain**, 464 U.S. 114,118 (1983). "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." **Irwin v Dowd**, 366 U.S. 717, 724-25 (1961). However, not every instance of juror misconduct requires a new trial. **Speed v DeLibero**, 215 Conn 308, 313, 575 A.2d 1021 (1990). A new trial is not required every time "a juror has been placed in a potentially compromising situation...[because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." **Rushin v Spain**, supra, 464 U.S.,118. Egregious forms of juror misconduct are the predicate for relief; such as the fraternization by two deputy sheriffs who were crucial prosecution witness, **Turner v**

---

[7]. The trial court expressed its displeasure with the questioning of jurors without the prior approval and supervision of the court and ordered that no further inquiries be conducted unless permitted by the court. (R.29)

14

**Louisiana**, 379 U.S. 466 (1965); a bailiff informing the jury that the accused was guilty and if there was any error the appellate court would correct it, **Parker v Gladden**, 285 U.S. 363 (1966); or a court charge allowing discussion of the evidence prior to actual deliberations, **State v Castonguay**, 194 Conn 416, 481 A.2d 56 (1984).

The rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair trial. **State v Hancich**, 200 Conn 615, 624-25, 513 A.2d 638 (1986). The trial court's ruling on a motion for a new trial will stand unless the court abused its discretion. **State v Thomas**, 210 Conn 199, 213, 554 A.2d 1048 (1989); see **United States v Grasso**, 600 F.2d 342, 343 (2d Cir. 1979). The trial court addresses the credibility of witnesses and the weight to be accorded their testimony in resolving matters of potential jury misconduct. **Speed v DeLibero**, supra, 215 Conn 314. Where the trial court is not responsible for the alleged juror misconduct, as is the case here, the trial court must find that actual prejudice resulted from such misconduct. **Asherman v State**, 202 Conn 429, 442, 521 A.2d 578 (1987)

Defendant based his claim for a new trial on presubmission discussions of Womble's demeanor and credibility and on one juror's

15

driving by the scene of the crime during the trial; each of these claims will be treated separately. The eight jurors were questioned on two different days; the trial court first explained to each juror that they would be asked questions and they were to be totally honest in their answers as they, the jurors, faced no sanctions themselves. (T.15, 6-7)  The trial court first questioned each juror and then allowed counsel, through the court, to ask additional questions.

a. Discussion of Womble's demeanor and credibility.

The trial court question every witness with regard to this claim.  Beverly Noehren testified that she did not hear any discussions about the credibility of witnesses or the guilt or innocence of defendant prior to deliberations.  She did hear one juror mention the fact that a witness was wearing jail clothing.[8] (T.15, 7)  Shelly Towers, an alternate juror, testified that some jurors mentioned that some witnesses were in jail cloths; and that a few jurors mentioned the fact that what Womble said on the witness stand and what he told the police was different.  She never heard any discussions about credibility. (T. 15, 26-28)  Stephanie Kowaleski testified that she never heard any discussions about witness reliability or credibility. (T.15, 34)    Barry Powell

---

[8]. The comments on witnesses all referred to witnesses called by the state; defendant did not offer any evidence.

16

testified that the foreperson, Geraldine Benton, and Noehren felt that the credibility of the witnesses was not good and both made comments on Womble's credibility.  Powell stated that this had no effect on his decision in reaching a verdict. (T. 49-50, 52, 63) He also stated that a young lady came up to him during the trial and asked how the case was going for Shawn; Powell told her he could not discuss the case and nothing further was said. (T.15 56-57)   Rupert Crosby did not remember any juror discussing the appearance or credibility of any witness prior to jury deliberations. (T.16 9,17)  Peter J. Miree stated that there was no discussion about witness credibility;  only that one juror did say that Womble was lying. (T.16, 23, 27)   Geraldine Benton, the foreperson, stated that she never discussed witness credibility until the case was given to the jury.  One day when she was at lunch with two other female jurors, one by the first name of Shelly, the other two started discussing the case and Benton told them to stop which they did. Benton testified that they never got as far as discussing appearance or demeanor of the witnesses. (T.16 35, 38-40)  The last juror questioned was Donnie Langly who stated that the only discussion about witnesses was that fact that some were in jail clothes. (T.16, 50-51)

"The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."

17

**United States v Klee**, 494 F.2d 394 (9th Cir.), cert. denied 419 U.S. 835 (1974). Here, each and every juror who stated that they over heard a conversation about Womble's testimony said it did not effect their final decision. Basically all that was stated was the obvious fact, that Womble had at some point lied. The trial court found that these comments were made by only a few individual jurors; that there was little or no discussion surrounding them and in fact most jurors were not part of any discussion. (R. 49)  "The important thing is not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury." **Ibid**. Here, defendant has failed to show he was prejudiced by these remarks.  **Asherman v State**, supra, 202 Conn. 442.

The Connecticut Supreme Court fully addressed this issue and "assume[d], without deciding, that it was the state's burden to prove that the discussion regarding Womble's credibility was harmless; . ." **State v Newsome**, supra, 238 Conn. 630. The court found these discussions "harmless beyond a reasonable doubt." **Ibid**. "Implicit in the trial court's findings, and also supported by the record, is that there was no indication that the jurors had expressed any opinion as to which, if either, of Womble's accounts of the shooting was truthful or whether the defendant was guilty. Thus, although improper, the remarks were limited in scope and did

18

not result in any juror committing himself or herself to a position on the evidence, the primary danger associated with jurors' resubmission discussions of the evidence or issues in the case." **Id.** 631.

b. Juror driving by the scene of the crime.

Stephanie Kowaleski testified that when she drives to the Trumbull Mall, a local shopping center, her route takes her by the crime scene; this is her normal route. (T.16, 34-35, 41) She testified that she went to the mall two or three times during the trial and believes she looked at the crime scene every time. She never stopped the car but merely drove by. She stated that when she went by the scene her purpose was not to get a better look. (T.16, 35, 39, 41) She did drive by the scene after pictures of the scene were introduced as evidence; she stated that she was not dissatisfied with the pictures but just happened to be driving to the mall. (T.16, 38-39) She testified that she did not remember the caution the trial court gave about going to the scene. (T.16, 38) She further testified that the scene had nothing to do with the crime, that nothing she saw at the scene contributed to her verdict in this case nor did it effect her verdict in any way.(T.16, 36-37, 42-43) Only one other juror questioned mentioned anything about the scene. Beverly Noehren testified that some jurors said they lived by scene and drove by it every day;

19

however, this was never substantiated by any other evidence.(T.15, 7)

The trial court found that the juror merely drove through the intersection two or three times without stopping; that it played no role in the conviction and was harmless beyond a reasonable doubt. (R. 50) The juror was quite clear in her testimony that this in no way effected her ultimate decision in this case. The Connecticut Supreme Court found that while this conduct was in violation of the trial court's instructions there was "no proof that the juror did so for the purpose of evaluating the evidence, conversed with other jurors about the case or was influenced by the incidents." **State v Newsome**, supra, 238 Conn. 633.

v.  Ineffective assistance of trial counsel:

Petitioner claims his trial counsel was ineffective in her cross-examination, failure to call a witness, failure to have victim's clothing treated, and failed to argue to the jury that Womble had shot Surrency.  This are the same claims he raised in his habeas petition which was heard in the Connecticut Superior Court and denied.  The denial was upheld on appeal. **Newsome v Commissioner of Correction**, 64 Conn.App. 904, 777 A.2d 757, cert. denied, 258 Conn. 921, 782 A.2d 1245.

Attorney Carol Goldberg testified she represented petitioner in his criminal trial. Attorney Goldberg began her  public defender

20

service in 1983 and came to the Bridgeport Judicial District in 1984. She could not estimate the number of cases she has handled. In her opinion the state did not have a strong case and she shared this view with her client. The only eye witness was Womble and he recanted his statement to the police both at the probable cause hearing and at trial. (TT. 15-16, 42) Petitioner was arrested in July of 1992 and the trial began in March of 1993; she began representing petitioner within weeks of his arrest. (TT. 13, 33) Petitioner testified he asked Attorney Goldberg to talk with a Keith Bland because Bland told petitioner he had spoken to Womble and Womble told Bland that he, Womble, did not actually see the shooting. He stated he gave this information to Attorney Goldberg prior to trial.(TT. 4, 5, 9) The first time Attorney Goldberg heard the name Keith Bland was when petitioner testified at the hearing .(TT. 36-37) Petitioner further testified that in his opinion Attorney Goldberg did not properly cross-examine Jared Fleming. When Fleming was asked on cross if he actually saw the shooter he said no. Petitioner testified that if Attorney Goldberg 'really pushed' Fleming he would have told her who the shooter was. (TT. 7-8) He based this opinion on the fact that Fleming witnessed the fight and therefore saw the shooter. (TT. 10) Attorney Goldberg testified that Fleming did not add much to the state's case and on cross-examination he admitted he could not identify the shooter;

21

she was satisfied with this answer. (TT. 37)

Attorney Goldberg testified that on cross-examination Womble testified that he told the police petitioner did the shooting because he was forced into saying it and the information contained in his statement was only what he heard. (TT. 17) Womble also testified on cross that when he gave his statement he thought there was an outstanding arrest warrant, that he was taken to a room and surrounded by police officers and felt intimidated.   Womble believed he told the police that he only heard petitioner was the shooter but the police testified otherwise at trial. (TT. 21) Attorney Goldberg testified that Womble's testimony changed a number of times at trial. (TT. 23)

Petitioner gave Attorney Goldberg a number of people to interview and from this she subpoenaed ten people to testify at trial. Attorney Goldberg was at the scene between July of 1992 and May of 1993, and during petitioner's trial, talking to various possible witnesses. None of these people gave petitioner an alibi but rather put petitioner at the scene.   None of these people stated Womble did the shooting nor was there any witnesses who said Fleming was the shooter.[9] (TT. 33-35,  38) This information was given to petitioner. Attorney Goldberg testified that from this group she had a number of witnesses she could have called but after

---

[9] Attorney Goldberg interviewed Fleming. (TT. 35)

22

many, many discussions with petitioner it was determined, by both petitioner and her, not to have the witnesses testify.  The reason being that this was a one witness case, the witness had recanted and it was questionable whether the jury would believe Womble. Attorney Goldberg further testified that  their testimony was inconsistent and would place petitioner at the scene. (TT. 27, 36)

Attorney Goldberg also considered third party culpability in that either Womble or Jared Fleming had committed the crime.  She requested, in a charging conference, that the  trial court instruct on third party culpability but the trial court refused. (TT. 27) The only evidence of Womble being the shooter was the fact he was at the scene. (TT. 31) Attorney Goldberg testified she  did not test the victim's clothing for the presence of beer nor did the state put on any such evidence. (TT. 26) She filed a motion to preserve evidence but she never received the clothing.  Attorney Goldberg testified that she did not consider the victim's clothing an important aspect of the case.  The state's case rested entirely upon Womble's written statement which  Attorney Goldberg tried unsuccessfully to exclude  at trial.(TT. 40-41)

The habeas court considered four claims of ineffectiveness and found  the remainder  of  the  claims  to  be  abandoned.  (R.  11) Petitioner does not address this finding and therefore these claims were not before the Connecticut Appellate Court. **State v Tweedy**,

23

219 Conn. 489, 510 n.17, 594 A.2d 906 (1991).  The habeas court did consider the claims that Attorney Goldberg failed to cross-examine state's witness, failed to present a witness, failed to test he victim's clothing and failed to argue to the jury that Womble shot the victim. (R. 11)  The appal of the denial of a writ of habeas corpus is governed by the certification requirement of §52-470(b) which provides that no appeal may be taken from the habeas court unless that court first certifies "that a question is involved in the decision which ought to be reviewed . . ."  In order to have an appellate court consider the merits of a habeas appeal the petitioner must  establish "a clear abuse of discretion in the habeas court's denial of his request  for certification". **Simms v Warden**, 230 Conn. 608, 616, 646 A.2d 126 (1994).  The appellate court must find that the issues, as presented by petitioner, "were debatable among jurists of reason, that they could reasonably have been resolved differently, or that they raised questions deserving further appellate scrutiny". **Id**, 618.  "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) **State v Reddick**, 224 Conn. 445, 467, 619 A.2d 453 (1993).  If petitioner succeeds in

24

surmounting this hurdle he " must also then demonstrate that the judgment of the habeas court should be reversed on its merits." **Sims v Warden**, supra, 230 Conn. 612. As will be argued below the habeas court did not abuse its discretion in finding that the writ did not meet the requirements of the statute.

It is clear under both the federal and state constitutions that petitioner is entitled to the effective assistance of counsel at trial and on appeal. **Gideon v Wainwright**, 372 U.S. 335 (1963); **Levin v Manson**, 195 Conn. 636,639, 490 A.2d 82 (1985). In order for a convicted defendant to prevail on his claim that his counsel's performance was so defective as to require reversal, he must prove not only that his attorney made errors so serious that he ceased to function as counsel, but also that there is a reasonable probability that, but for these unprofessional errors, the results of the proceedings would have been different. **Hill v Lockhart**, 474 U.S. 52, 57 (1985); **Blakeney v Commissioner of Correction**, 47 Conn.App. 568,582, 706 A.2d 989, cert. denied. 244 Conn. 913, 713 A.2d 830 (1998). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . that course should be followed." **Strickland v Washington**, 466 U.S. 668, 697, reh. denied, 467 U.S. 1267 (1984) as quoted in **Allion v Meachum**, 211 Conn. at 362. With respect to the prejudice competent, petitioner must show that "counsel's errors

25

were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." **Strickland v Washington**, 466 U.S. at 687. Basic to habeas corpus law is that error which might justify reversal on appeal will not necessarily support a collateral attack following a final judgment. **United States v Addonizio**, 442 U.S. 178, 184 (1979). The United States Supreme Court of recently stated that in an appeal form a state habeas it is not whether it would have reached the same conclusion as the state court, but that it must find the state court decision is unreasonable. **Wiggins v Smith**, U.S. No. 02-311, 73 CrL 365.

Throughout petitioner's argument at the state court level he maintained that the four claims considered by the habeas court all amount to instances of ineffective assistance of counsel; however, he has failed to argue how these alleged errors prejudiced his trial. Without such a showing petitioner cannot prevail. In order to prevail on the prejudice prong petitioner must establish that there exists a reasonable probability that the result of the trial would have been different. **Levine v Manson**, 195 Conn. at 640. "A reasonable probability is a probability sufficient to undermine confidence in the verdict." **Dontigney v Commissioner of Correction**, 42 Conn.App. 304, 305, 679 A.2d 55, cert. denied 239 Conn. 918, 682 A.2d 999 (1996). Under the reasoning of **Strickland v Washington**, supra, 466 U.S. 687, this Court should dispose of this claim under

26

the prejudice prong.

If these claims are examined under the first prong there is no evidence that Attorney Goldberg's representation fell below an objective standard of reasonableness. Attorney Goldberg's decision regarding the cross-examination of Womble and Fleming was a tactical one based on sound strategy. Attorney Goldberg felt that Fleming's testimony did not harm petitioner and she had to treat Womble carefully as she wanted the jury to believe Womble's in-court testimony and not his statement. Petitioner has failed to show this is anything less than sound trial strategy. **McClendon v Commissioner of Correction**, 58 Conn.App. 436, 437, 755 A.2d 238, cert. denied 254 Conn. 920, 759 A.2d 1051 (2000).

Attorney Goldberg testified she did not know of Bland until the habeas hearing. Even if she knew of him prior to trial his testimony would have impeached Womble with information the jury had through Womble. Again, Attorney Goldberg had to balance her cross-examination of Womble with his in-court testimony and there is no showing that deciding not to put cumulative impeachment evidence of Womble before the jury was not sound trial strategy. The same can be said of the testing of the clothes. If the test came back positive showing that beer was poured on the victim her strategy in discrediting Womble's statement would have severely been impaired.

The last claim concerns Attorney Goldberg's failure to argue

27

to the jury that Womble was the actual shooter. There was absolutely no evidence presented at trial or at the habeas hearing that in any way directly connected Womble with the murder. The only connection is his mere presence at the scene.   It has long been held that   it is not enough to raise a bare suspicion that some other person may have committed the crime, there must be some evidence which directly connects a third party, Womble, to the murder. **State v Ortiz**, 252 Conn. 533, 564, 747 A.2d 487 (2000), **State v Hernandez**, 224 Conn. 196, 202, 618 A.2d 494 (1992).   It is clear that petitioner was not entitled to a jury charge on third party culpability. Nor could Attorney Goldberg argue third party culpability to the jury.   "Statements as to facts which have not been proven amount to unsworn testimony that is not the subject of proper closing argument." **State v Williams**, 204 Conn. 523, 544, 539 A.2d 276 (1996).   Petitioner claims that the reason there was no evidence linking Womble directly to the murder is Attorney Goldberg did not develop any at trial. The simple fact is that no such evidence exists as petitioner did  not presented any  facts to the habeas court directly linking Womble to the murder but rather relies on speculation and conjecture.

28

CONCLUSION

    For the reasons stated above the respondent respectfully requests that this Court deny the writ of habeas corpus.


Frederick W. Fawcett
Supervisory Assistant State's Attorney
Fairfield Post Conviction Remedy Unit
1061 Main Street
Bridgeport, Connecticut 06604
Telephone 203-579-6506
Facsimile 203-382-8401
Federal Bar number ct10734