UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN NEWSOME                  :      CIVIL NO.: 3:01CV1968 (DJS)

　　 *Petitioner*                   :

                               :

V.                             :

                               :

COMMISSIONER OF CORRECTION      :

　　 *Respondent*                   :      December 8, 2003

## MEMORANDUM OF LAW IN SUPPORT OF PETITION
## FOR A WRIT OF HABEAS CORPUS

### NATURE OF PROCEEDINGS

On May 26, 1993 the petitioner, Shawn Newsome, was convicted

of murder, Conn. Gen. Stat. 53a-54a, by a jury in the

Bridgeport Superior Court. The Honorable Samuel Freedman

presided at trial. On March 10, 1994 Judge Freedman denied

Newsome's motion for a new trial. On April 15, 1994 Judge

Freedman sentenced the defendant to serve forty-five (45) years

in prison. On June 6, 1994, Newsome appealed from that judgment

to the Connecticut Supreme Court claiming that the evidence at

the hearing in probable cause was insufficient, that the evidence

was insufficient to sustain his conviction, that there was jury

misconduct, and the predicates for the admission of a statement

under State v Whalen, 200 Conn. 743, 513 A.2d 86, cert. denied

479 U.S. 994 (1986), should be modified. On August 6, 1996, the

petitioner's conviction was upheld, State v Newsome, 238 Conn.

was insufficient to sustain his conviction, that there was jury

misconduct, and the predicates for the admission of a statement

under State v Whalen, 200 Conn. 743, 513 A.2d 86, cert. denied

479 U.S. 994 (1986), should be modified. On August 6, 1996, the

petitioner's conviction was upheld, State v Newsome, 238 Conn.

588, 682 A.2d 972 (1996). According to the Court, at pages 590-592:

> The jury reasonably could have found the following facts.
> At approximately 10:30 p.m. on March 4, 1992, Bridgeport
> police officer David Daniels heard two gunshots fired in
> the area of 455 Trumbull Avenue in Bridgeport. When Daniels
> responded to the location where he believed the shots had
> been fired, he saw a car leave the area and discovered the
> victim, Lance Surrency, lying in the grass in front of 385
> Trumbull Avenue. The victim had been shot in the face and
> was unresponsive. He died shortly thereafter.
>
> The following day, the police questioned Rodney Womble
> about the shooting. In a signed, sworn statement, Womble
> identified the defendant as the person who had shot the
> victim. Womble told the police that on the previous evening
> he had observed a fight between the victim and several other
> men, including the defendant, while they were standing near
> a "food bus" in a parking lot of the Trumbull Gardens
> Housing Complex. Womble stated that the defendant had poured
> beer on the victim to provoke him to fight and had then
> taken out a gun and shot the victim. He further stated that
> immediately after the shooting, the defendant had entered
> a car parked nearby and had driven away.
>
> The defendant was subsequently arrested and charged with the
> victim's murder. At both the probable cause hearing and at
> trial, Womble testified that although he had witnessed
> the shooting, he had not been able to identify the person
> who had shot the victim. Womble admitted that he had told
> the police that the defendant was the shooter, but claimed
> that he had only heard rumors that the defendant had shot
> the victim and had given the defendant's name to the police
> in order to leave the police station as quickly as possible.
>
> At the probable cause hearing, the state introduced the
> portion of Womble's prior statement to the police in which
> he described the shooting. The segment of the statement was
> offered for substantive purposes pursuant to State
> v. Whelan, 200 Conn. 743, 513 A.2d 86, cert. denied,
> 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986).
>
> The trial court found probable cause to believe that
> the defendant had murdered the victim. At trial, the state
> introduced Womble's entire statement, with some redactions,
> for substantive purposes pursuant to Whelan, Womble's
> statement provided the only identification evidence against

the defendant. The jury found the defendant guilty of murder.

The petitioner filed a petition for a writ of habeas corpus, dated April 30, 1997, claiming his trial counsel, Attorney Carol Goldberg, a Supervisory Assistant Public Defender, was ineffective. On December 29, 1998 an amended petition was filed again alleging ineffective assistance of trial counsel. The amended petition alleged trial counsel was ineffective in that trial counsel failed to conduct an adequate pretrial investigation of the facts and the applicable law, failed to object to inadmissable evidence and erroneous instructions, failed to suppress an out-of-court identification, failed to properly cross-examine state's witnesses, failed to object to the trial court's jury instructions as to the crime charged, failed to challenge the sufficiency of the evidence, failed to obtain or preserve taped statements of witnesses, failed to request proper jury instructions, and failed to litigate an issue of juror misconduct.

A hearing was held before the Honorable Jon M. Alander on February 23, 2000 and on May 16, 2000 the petition was denied. Petitioner then filed a petition for certification which was denied on May 24, 2000. Petitioner then filed an appeal to the Connecticut Appellate Court claiming the trial court abused its discretion in denying his certification to appeal. The appeal was dismissed, Newsome v Commissioner of Correction, 64 Conn.App. 904, 777 A.2d 757 (Memorandum decision, 2001). Petitioner filed

certification for appeal with the Connecticut Supreme Court which was denied, Newsome v Commissioner of Correction, 258 Conn. 921, 782 A.2d 1245 (2001).

On October 18, 2001, Newsome filed the instant petition pursuant to 28 U.S.C.A. §2254.

### STATEMENT OF FACTS

The state prosecuted Newsome for the street shooting of 29-year-old Lorenzo Surrency on Trumbull Avenue in Bridgeport at about 10:30 p.m. on March 4, 1992.  The defendant was 17 years old at the time.  The state's only evidence tending to identify Newsome as the shooter was a sworn statement given to a Bridgeport detective on March 5, 1992 by 24 year old Rodney Womble.  Repudiating the identification he gave in the statement, Womble testified at the probable cause hearing and at trial that he had been nearby when Surrency was shot, that he had not seen the face of the shooter, and that he identified the defendant as the shooter based only on rumors he heard.  Womble, a convicted felon with a case pending and a warrant for his arrest outstanding, said that he was in a hurry to get out of  the police station so he misled the police by stating what he had heard, not what he had seen.  His police statement was admitted in evidence at the probable cause hearing and at trial as substantive proof of the defendant's identity under State v.Whelan, 200 Conn. 743 (1986).

The state offered no corroborative evidence of the element of identity.   The central issue presented by this case is whether a Whelan statement alone may sustain a jury conclusion

that identity has been proven beyond a reasonable doubt.  See
State v. Hopkins, 222 Conn. 117, 123-24 (1992).


The Preliminary Hearing on Probable Cause

On July 9, 1992, the Honorable G. Sarsfield Ford presided
at the preliminary hearing on probable cause pursuant to Gen.
Stat. 54-46a.  The state presented two witnesses, Rodney Womble
and Detective Lynn DeSarli, and the report on the decedent's
autopsy.

Rodney Womble, a prison inmate at the time of the hearing,
testified that he was in a parking lot on Trumbull Avenue in
Bridgeport near Trumbull Gardens apartments when a "bunch of
guys" jumped on Lorenzo Surrency.  Womble had known Surrency for
a few years and classified him as "just an associate." T.4, pp.
3-4.  Womble called the event "just a regular street fight." Id.,
4-5.  Womble said that he observed the scene from "not too far
away" near a "food bus" -- a regular school bus, "a little
extended," out of which food was sold.  Id., 6-7.  Womble
testified that one of the fighters took a gun from out of his
hooded sweater and shot Lorenzo Surrency.  Womble related that he
could not see the face of the shooter because of the hood, but
that he did see the gun.  T.4, pp. 5-6.

The state's direct examination next established that Womble
had talked to a female detective in the mid-afternoon on March 5,
1992 at the Bridgeport police station.  The detective asked
questions and Womble answered as she typed.  Womble read, signed
and swore to the statement.  Id., 10-12.  He testified that the

written statement accurately reflected the questions and answers
at the interview.  Id., 12.  Womble explained that "I did tell
them" who shot Surrency but that he had not actually observed the
identity of the shooter.  Id., 15-16.  Womble testified that he
had not indicated to the Bridgeport detective that he had seen
who shot Lorenzo Surrency.  Id., 15. Over defense counsels
objection,[1] the state's offer of a "portion" of the statement
marked as State's Exhibit 2 (later State's Exhibit H for
identification at trial) was "admitted" in evidence under the
doctrine of State v. Whelan, 200 Conn. 743 (1986).  T.4, pp. 17-
20.  Specifically, the state put in evidence the portion that
answered the question "what occurred last night?".

> Q.  Please tell me in your own words what occurred last
>     night?
>
> A.  All the young BOYB were out there behind the bus, the
>     food bus, They were all scuffling against Lorenzo.
>     Shawn Newsome, Jerry Fleming, Fats, Major they were all
>     hitting on him, for what reason I don't know.  Shawn
>     poured beer on him trying to entice him to fight.
>     Lorenzo knew he couldn't fight five of them so he kept
>     backing up.  Major
>     tried to help him in the end, he told Lorenzo to run,
>     but Shawn pulled out the gun and shot Lorenzo.  They
>     were only 3 or 4 feet away.  A blue regal was parked
>     right there and Shawn jumped in and drove away.  He
>     came back later in another car.  The car he came back
>     in was a dark blue car, maybe an older New Yorker.  He
>     just kept driving up and down the street drinking and
>     smoking.

T.4, p. 17; App. 18-19 (State's Exhibit 2 for HPC).

---

[1] Defense counsel argued that the statement offered was not
inconsistent with Womble's in-court testimony because it did not
contradict his testimony that he did not tell the police that he
actually saw the defendant shoot Surrency.

On cross-examination, Womble insisted that he had not <u>seen</u>

Newsome in the group

of boys fighting Surrency.  <u>Id.</u>, 21-22.  He stated, "I saw it

[the incident] mostly, but I heard

Shawn's name: That's how I got to Shawn's name." <u>Id.</u>, 23.  <u>See</u>

<u>also id.</u>, 26 ("cause that's who I heard who did the shooting").

On re-direct, Womble acknowledged that he had not told the

detective that he had not <u>seen</u> what he told them had occurred the

night before.  <u>Id.</u>, 29.  On re-cross, Womble stated that "I

didn't say it wasn't true.  I said that's what I heard the night

before." Id., 30.  He said he was trying to cut the police

interview "short as I could, cause I was wanting to get out of

there." <u>Id.</u>, 30.

The state's other witness, Detective Lynn A. DeSarli,

testified very briefly.  <u>Id.</u>, 31-35.  Detective DeSarli stated

that she conducted the interview of Womble and that she had

"actively recorded" Womble's answers to her questions.  Id.,

3132. DeSarli asserted that Womble had said he knew who the

shooter was and that Womble never said that he had only heard the

information on the streets.  Id., 32-33.  DeSarli claimed that

Womble said he saw Newsome shoot Surrency.  Id., 33.

Judge Ford then heard summations from counsel.  The state

argued that, though he now "hedges,"  "[h]e tells me everything

in the statement is true." Id., 43.  The state noted that Womble,

now incarcerated, had not been in jail when he gave his,

statement to DeSarli.  The state argued that Womble had never

told DeSarli that his information identifying Newsome was based on hearsay, not first-hand observation.  Id., 44.

Defense counsel argued that it would be "absolutely unconscionable" to find probable cause because Womble's in-court testimony highlighted the infirmity of his identification of Newsome as the shooter in his statement to DeSarli.  Counsel noted that the written statement showed that Womble was never asked directly whether he saw Newsome shoot Surrency.  Counsel also argued that Womble's desire to get out of the police station further undercut the reliability of his statement implicating Newsome.  T.4, pp. 44-46.  Judge Ford, however, ruled that the evidence "clearly dictates that probable cause must be found, and this case should be held for trial, and the issues can be fully developed by a tryer [sic] of fact, and they can have an opportunity at justice.  Probable cause is found." T.4, pp. 49-50; App. 30-31.


The Trial Evidence

The state established that the decedent, Lorenzo Surrency, died of a gunshot wound to the left side of his face from a .38 caliber bullet fired from a revolver, probably a .38 special or 357 magnum.  T.11, pp. 192-95, 203 (testimony of Dr. Wayne Carver, forensic pathologist); T.11, pp. 342-45 (Edward McPhillips, firearms examiner).  The autopsy showed that the decedent's' blood contained cocaine in a concentration of .36 milligrams, considered "somewhere above the average" for a person

using cocaine. <u>Id.</u>, 204, 212.  Three small vials of crack cocaine[2] were found on the decedent's person at the autopsy. <u>Id.</u>, 206.

Officer David Daniels, a Bridgeport policeman, testified that on the evening of March 4, 1992 he was putting in overtime "working security" in Building 10 of the Trumbull Gardens Housing project at 455 Trumbull Avenue in Bridgeport.  T.10, pp. 55-57. At about 10:30 p.m., as he was sitting in the lobby of building 10, Daniels heard two gunshots, at which point he ran out of the building and up Trumbull Avenue toward Reservoir Avenue.  <u>Id.</u>, 57-58.  Daniels was a "football field" away from the spot of the shooting when he went onto the street.  <u>Id.</u>, 62.  Daniels learned that a person had been shot and located the victim on a grassy area between two picket fences depicted in State's Exhibit c, one of three photographs of the area entered in evidence by the state.  <u>Id.</u>, 58-61, 89-91.  It took Daniels a minute to get to the victim's location.  <u>Id.</u>, 62.

Daniels testified: "When I got there I saw a -- a lot of activity, you know, people moving around a lot ....  <u>Id.</u>, 58.  As he approached the scene, he observed "people moving around and a car leaving the scene."  <u>Id.</u>, 71-72.  The car headed toward Reservoir Avenue and took a right turn.  Daniels said it was too far away for him to see its make, model or license number.  <u>Id.</u>, 72, 96-97.  The victim, a black male in his late twenties, had

---

[2] Two vials contained white powder, the third contained residue.  T.11, p. 206.

been shot in the cheek and was not responsive. Id., 63.  A small
crowd gathered and grew in size as police and ambulance personnel
arrived.  Id., 64.  No one came forward with information on the
shooting and no physical evidence was found. Id., 64, 72, 97.

Two state's witnesses, Jared Fleming, a sentenced prisoner,
and Vanessa Fleming, his mother, testified that Jared Fleming had
been in a fight with the decedent, Lorenzo Surrency, sometime
earlier on March 4, 1992.  T.11, pp. 219-27, 351-53, 365.  Ms.
Fleming had come to her son's aid, pulled Surrency off her son,
and ordered her son into their apartment at 372A Trumbull Avenue,
where Jared watched TV.  Id. Ms. Fleming testified that other
people were around when she broke up the fight but she could not
recall if the defendant had been.  Id., 359-60.  Ms. Fleming
heard gunshots sometime later, went to her window, and saw
Officer Daniels near the decedent.  Id., 359-60.  Ms. Fleming
acknowledged that she "probably" heard "screeching  wheels" after
the gunshots.  Id., 358-59.[3]  Ms. Fleming  testified that other
people were around when she broke up the fight but she could not
recall if the defendant had been.  Id., 359-60.

Rodney Womble was the witness crucial to the state's case
because only Womble provided any evidence on the identity of the
killer.  Womble testified that at about 10-10:30 p.m. on March 4,
1992 he was "standing in the first parking lot on Trumbull

_____

[3]The defense cross-examined Ms. Fleming about her interest -
t'n preventing her son from becoming a suspect in the shooting.
T.11, pp. 365-70.  Both the state and the defense impeached Ms.
Fleming with her criminal convictions, which included convictions
in 1986 and 1991 as a persistent larceny offender, in 1987 for
first degree larceny.  Id., 364, 371.

Avenue." T.11, pp. 247-48. He indicated on State's Exhibit C, a photograph of the street, his location, id., 248-49; and the location of the shooting, id., 258. Womble told the jury that at about 10:30 p.m. he had "seen a bunch of guys jump on Lorenzo."

The "guys" included "Jerry [Fleming] and Fats and I don't know a few, a couple other people." T.11, p. 251. He testified that he was a "bus length" away. Id., 257. Womble said the group was "hittin on" Lorenzo Surrency, i.e., "Beatin him up." Id., 252-53. Womble identified State's Exhibit H for identification as the statement he made to a lady detective at the police station the day after the shooting. He acknowledged that he told the police that "Shawn" and "Major" were in the group fighting Surrency. Id., 251-52. But his testimony at trial was that, while there were "quite a few" people fighting, he did not "think Shawn was there at the time they was fighting him." Id., 253-54.

The state asked Womble point blank "why did you mention his name to the police?" Womble replied: "Because I told them I heard it the next day--that he was the one that did it and I was--and I had just mentioned his name just to hurry up and get out of the police station real quick." T.11, p. 254, also p. 323. Womble acknowledged telling the police that Newsome had poured beer on Surrency to entice him to fight. Id., 255. He acknowledged telling the police that "Shawn pulled out the gun and shot him.,, Id., 256. But Womble told the jury that "I didn't actually see him [Shawn] that night." Id., 260, 277.

The state offered Womble's police statement as a prior inconsistent statement under State v. Whelan.  Id., 267-68.  The trial court agreed that "there's a pretty basic disagreement here, the statement apparently says that the Defendant shot Lorenzo Surrency and he now says that he was not there and he did not see him." Id., 267-68.[4]  Womble's statement, slightly redacted, was entered into evidence as State's Exhibit L and the clerk read it to the jurors.  Id., 309-14.

On cross-examination Womble reiterated that he had not seen Newsome at the fight and that he had been unable to see the identity of the shooter.  T.11, pp. 315-16, 325, 327-28.  He averred that he was trying at trial to "right the wrongs" contained in his statement to the police.  Id., 319.  Womble testified that the police had told him he had to go to the police station to answer questions, that the police had a file on Womble with his picture in it, that he was afraid he would be in trouble if he did not go, and that he had pending charges in a criminal case at the time and feared incarceration.  Id., 320-21. Womble added that he was shown a warrant for his arrest on another matter by Detective DeSarli, but that she did not serve the warrant on him.  Id., 321-22.

---

[4]After a weekend recess amid Womble's testimony, the court had received a note from a juror:
> THE CLERK: 115-24-93.  Your Honor, the last witness on Friday had conflicting statements, no one asked for clarification if the witness saw Shawn or did he not see him.  I feel this is vital information to this case.  Can you get a straight answer, sir?  Geraldine Fenton, Juror."

T.11, p. 289.  See Court's Exhibit A.

Detective Linda A. DeSarli testified that she and Detective
Richard Herlihy had found Rodney Womble in a parking lot the day
after the shooting and that he had voluntarily agreed to be
interviewed by her at the Detective Bureau. T-10, pp. 123-24,
163. She interviewed Womble and took a statement from him which
she typed and had him read, sign and swear to. Id., 126-28.
DeSarli asked Womble to select Newsome's photograph from an array
of 6, which Womble did. Likewise she had him select Jared
Fleming's photograph from a second array of 6. Id., 128-36.

DeSarli said she feels frustration when no witnesses come
forward to help an investigation. She said that when witnesses
do come forward "I make the most of what they say." T.11, p. 160.
She confirmed that she had a file on Womble including his mugshot
and computerized law enforcement records when she met with
Womble. Id., 161-62. She could not remember whether she told
Womble that there was an outstanding warrant for his arrest on
another matter. Id., 166-67.

Detective DeSarli resumed the witness stand at the end of
the state's evidence and testified, over objection, that
Womble had told her on March 5, 1992 that "he had a fear that if
he said something, if he came forward with the information he had
that the people out there might get him." T.12, pp. 378-79. On
cross-examination DeSarli clarified that her conversation with
Womble about his fear was "in a pre-statement interview" --not in
the statement interview that she typed for Womble's signature.
Id., 379-80. DeSarli admitted that she had never reduced to
writing Womble's declaration of fear and that she had not

taped the conversation even though the Detective Bureau has audio and video recording equipment.  Id., 379-82.

The defendant did not present evidence.  During deliberations, the jury requested that Womble's entire testimony be replayed.  T.12, pp. 493-94.  The jury returned a guilty verdict, which the court accepted.  Id 496.  Alerted by defense counsel that a juror may have had pre-verdict communications with the defendant's family, the court conducted a brief inquiry of the discharged jurors and decided that no significant communications had occurred.  T.13, pp. 1-5.

Motion for New Trial

On June 1, 1993 the defendant's counsel, Assistant Public Defender Carolyn Goldberg, filed a motion for a new trial based on presubmission jury discussions of the evidence and juror contact during trial with the defendant's family.  On June 23, 1993, the defendant's motion for appointment of a special public defender "for the limited purpose of post-trial motion(s)" was granted and Attorney James Ruane was appointed.  On August 6, 1993 Attorney Ruane filed a motion for a new trial and a "Motion for Evidentiary Hearing on the Defendant's Motion for New Trial."

On September 15, 1993 Judge Freedman presided at a hearing on the motion for an evidentiary hearing and considered evidence of juror misconduct presented by the defense through an investigator, James P. McNamara, a former FBI agent retained to interview the discharged jurors concerning presubmission discussions by them of the case.  McNamara's written reports on his juror interviews were offered in evidence.  By a memorandum

of decision dated October 14, 1993 Judge Freedman decided that the court would hear the testimony from five jurors and one alternate juror on the defendant's claims that jurors discussed the case before deliberations and one juror had visited the crime scene. On hearings on December 13 and 21, 1993 Judge Freedman personally questioned seven jurors and one alternate juror. Judge Freedman used McNamara's reports in his questioning of the jurors at the hearing. In a memorandum of decision dated March 10, 1994, Judge Freedman denied the motion for a new trial.

## LEGAL ARGUMENT

### INTRODUCTION

Newsome's first three claims concern the trial court's admission of Womble's out of court inconsistent statement. State v Whalen, supra. His first claim is that the evidence was insufficient to sustain the conviction, secondly, that the admission of the statement denied him due process under the Fourteenth Amendment, and lastly, that this statement constituted the sole evidence of his guilt and therefore violated due process. *See* California v Green, 399 U.S. 149, 164 n.15 (1970). These claims are intertwined as they all involve petitioner's right of due process under the Fourteenth Amendment.

Newsome's fourth claim asserts that he was denied due process when the state trial court denied his request for a new trial based upon juror misconduct involving presubmission discussions by the jurors. His fifth, and final claim asserts ineffective assistance of counsel.

## EXHAUSTION OF AVAILABLE STATE JUDICIAL REMEDIES

As a threshold matter, the Respondent contends that Newsome has failed to exhaust his federal claims in state court. While it is true that "a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus," Picard v. Connor, 404 U.S. 270, 275 (1971), in this case, the Court need not determine whether Newsome exhausted state remedies. Even if any of his claims are unexhausted and thus procedurally barred, a federal habeas petitioner may avoid default by showing that failure to consider the claim will result in a miscarriage of justice. See Coleman v. Thompson, 501 U.S. 722, 748 (1991). This exception is reserved for those rare cases in which the petitioner can demonstrate that absent the constitutional violation, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup v- Delo, 513 U.S. 298, 327 (1995); see also Murrav v. Carrier, 477 U.S. 478, 496(1986). Given that the testimony of Rodney Womble was the lynchpin of the prosecution's case, it is likely that without Womble's prior statement Sean Newsome would not have been convicted. Therefore, the Court should proceed to the merits of Newsome's claims.

## AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) mandates that a federal court may not grant a petition of habeas corpus unless adjudication of the claim by the state courts

(1) resulted in a decision that was contrary to, or
    involved an unreasonable application of, clearly
    established federal law, as determined by the Supreme
    Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence
    presented in the State court proceeding.

28 U.S.C. 2254(d). In addition to granting considerable
deference to state court factual findings, AEDPA directs federal
courts to honor legal conclusions of state courts so long as they
can be reasonably reconciled with Supreme Court precedent. *See*
*Williams v. Taylor*, 529 U.S. 362, 412 (2000). Moreover, "it is
not the province of a federal habeas court to reexamine state-
court determinations on state-law questions. In conducting
habeas review, a federal court is limited to deciding whether a
conviction violated the Constitution, laws, or treaties of the
United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).
The penultimate question presented to the Court is whether the
conviction of Newsome based soley on the prior inconsistent
statement of Rodney Womble denied Newsome the due process of law.
For all the reasons stated below, Newsome asserts that he was
indeed denied due process of law in violation of his
constitutional rights.

**THE PRIOR INCONSISTANT STATEMENT OF RODNEY WOMBLE**

The Supreme Court has never held that admission of a prior
inconsistent statement that is without corroboration—even if this
is the sole evidence upon which a defendant is convicted—violates
the due process clause. In <u>California v. Green</u>, 3999 U.S. 149,

164 (1970), the Supreme Court held that the use of a prior statement of a co-conspirator as substantive evidence did not violate the Confrontation Clause, however, the Court suggested in a footnote that "considerations of due process, wholly apart from from the Confrontation Clause, might prevent convictions where a reliable evidentiary basis is totally lacking." Id. In both Jackson v. Virginia, 443 U.S. 307, 324 (1979) and In re Winship, 397 U.S. 358, 364 (1970), the U.S. Supreme Court held that no criminal conviction could properly rest on proof less than proof beyond reasonable doubt. These cases establish that federal habeas corpus relief can be granted "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. AEDPA empowers federal courts to intervene in regard to mixed questions of law and fact (such as a sufficiency of the evidence claim) when a state court decision rises to such a level that it is an "objectively unreasonable" application of federal law. Boyette at 90; see also Francis S. v. Stone, 221 F.3d 100, 111 (2nd Cir. 2000)("[A] state court decision must be not only erroneous but also unreasonable. Some increment of incorrectness beyond error is required."). Despite granting the state court the deference mandated by AEDPA, viewing the evidence upon which Newsome was convicted in a light most favorable to the prosecution, as the Court must on habeas review, see Quartararo v. Hanslmaier, 186 F.3d 91, 96 (2nd Cir. 1999), cert. denied, 528 U.S. 1170 (2000), (citing Wright v. West, 505 U.S. 277, 296 (1992)), it cannot be said that the decision of the

Connecticut Supreme Court to affirm the jury verdict was objectively reasonable. Newsome's conviction is not properly based upon proof beyond reasonable doubt, and thus is in violation of clearly established Federal law as determined by the Supreme Court of the United States. He is thus entitled to relief by this court.

In deciding <u>Jackson v. Virginia</u>, the Supreme Court expressly held that a federal court reviewing a sufficiency of the evidence claim must decide:

> . . . whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt

<u>Jackson</u> at 313. In <u>Jackson</u> the question was whether the evidence of the defendant's intoxication negated the premeditation element of Virginia's second degree murder statute. The court narrowly delineated the question posed by the case then before it as being:

> . . . whether the due process standard recognized in <u>Winship</u> constitutionally protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion that every element of the crime has been established beyond a reasonable doubt

*Jackson* at 313 - 314. The court in deciding *Jackson* relied heavily on <u>In re Winship</u>, 397 U.S. 3 5 8 (1970). The defendant in <u>Winship</u> was a juvenile who had been adjudicated a juvenile delinquent by a court which used the "preponderance of the evidence standard." That court specifically stated that, had it